# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

   Plaintiff,

vs.                No. CR 24-375 JB

SHERYL WILLIAMS STAPLETON, and
JOSEPH JOHNSON,

   Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Sheryl Stapleton's Motion for Severance of Defendant Joseph Johnson For Trial, filed December 5, 2024 (Doc. 43)("Severance Motion"). The Court held a hearing on February 18, 2025. See Clerk's Minutes at 1, filed February 18, 2025 (Doc. 60). The primary issue is whether the Court should sever the trials of the two Defendants, Sheryl Williams Stapleton and Joseph Johnson, and give them separate trials, pursuant to rule 14(a) of the Federal Rules of Civil Procedure, because Johnson may testify that Stapleton stole from him by writing checks to her foundation and for her expenses without his authorization. The Court concludes that severance is not warranted here. First, there is not a "serious risk that a joint trial would compromise" Stapleton's specific trial rights, Zafiro v. United States, 506 U.S. 534, 539 (1993), because: (i) the Court predicts that Johnson will not take the stand to tell the jury that Stapleton cashed his checks without his authorization and consent; and (ii) even if Johnson does take the stand, Stapleton and the United States can cross-examine Johnson, which eliminates the possibility that Stapleton's rights under Bruton v. United States, 391 U.S. 123 (1968)("Bruton"), would be violated. Second, Stapleton's and Johnson's defenses do not rise to the level of mutual antagonism that would prevent a jury from making reliable determinations about guilt and innocence. See Zafiro, 506 U.S. at 539. Finally, weighing the low

risk of prejudice against a joint trial's efficiency counsels against severance. Accordingly, the Court denies the Motion.

**FACTUAL BACKGROUND**

On July 28, 2021, law enforcement agents with the Federal Bureau of Investigation ("FBI") interview Johnson[1] at his home in Chantilly, Virginia. See Transcript of Audio File Labeled: Interview of Joseph Johnson at 2:1-6 (dated July 28, 2021), filed February 25, 2025 (Doc. 61)(Balint)("Johnson Tr."). After greeting Johnson at his door, Johnson invites the FBI agents inside to talk, at which point FBI Special Agent Robert Balint informs Johnson that the FBI is investigating "government funds going through Albuquerque Public Schools to vendors." Johnson Tr. at 3:13-15 (Balint). Agent Balint asks Johnson if he is familiar with Robotics Management Learning Services ("Robotics Management"), and Johnson states that he is. See Johnson Tr. at 7:24-8:2 (Balint)(Johnson). Johnson informs Agent Balint that he is Robotics Management's Director. See Johnson Tr. at 10:17-18 (Johnson). Robotics Management, according to Johnson, sells software to Albuquerque Public Schools ("APS") that helps students "understand how to use math" in various trades. Johnson Tr. at 11:4-11 (Johnson). See Johnson Tr. at 18:19-19:1 (Johnson).

Agent Balint asks Johnson how APS pays Robotics Management. See Johnson Tr. at 21:1-4 (Balint). Johnson tells Agent Balint that APS sends payments to Robotics Management to Robotics Management's post office box in Albuquerque. See Johnson Tr. at 21:1-6 (Johnson). Agent Balint inquires if Stapleton is involved with the payment between APS and Robotics Management, and Johnson states that he has, at times, "asked Sheryl to help me find people to

---

[1]For context and to orient the reader, the Court notes that Stapleton was a New Mexico State legislator from 1995 until 2021, and Johnson is Stapleton's close friend.

pick up the check." Johnson Tr. at 55:20-25 (Johnson). Stapleton, Johnson explains, is the director of "the program that administers Robotics." Johnson Tr. at 23:17:19 (Johnson)(Court adds brackets).

The investigators continue to home in on the financial relationship between APS, Robotics Management, and Stapleton; Balint asks, "Does [Stapleton] have any role -- would there be any reason why she would be receiving money from Robotics?" See Johnson Tr. at 25:3-5 (Balint)(Court adds brackets). Johnson responds: "She's receiving no money from Robotics . . . . she has nothing to do with the checks." Johnson Tr. at 25:6-7 (Johnson)(Court adds brackets); id. at 26:3 (Johnson).

Next, Agent Balint inquires about the beginning of the business relationship between Robotics Management and APS, asking Johnson to "talk a little bit about as far as, you know, how it came about, you and -- you and Sheryl taking the steps to secure the bid for -- for Robotics ?" Johnson Tr. at 30:1-3 (Balint)(Court adds brackets). Johnson replies that Stapleton "had nothing to do with" securing the bid for Robotics Management: "It was put out by the procurement department . . . I mean, she saw it . . . once it got turned in. But she did not -- she did not facilitate the bid at all." Johnson Tr. at 30:4-116 (Johnson). He goes on to ask: "Is she aware of any of this? I mean, can I share any of this with her or not?" Johnson Tr. at 36:23-25 (Johnson). Agent Balint responds: "She was contacted this morning . . . authorities have been speaking to her today. And I believe they're -- yeah, they're looking through finances on her end. So, you know, we're following up . . . as a direct relation to that, you know." Johnson Tr. at 37:1-7 (Balint). Johnson maintains that the United States "will not find any money from Robotics " in Stapleton's account. Johnson Tr. at 37:8-9 (Johnson)(Court adds brackets).

Shortly after this exchange, Agent Balint calls Special Agent John Howard, the lead case

agent in Albuquerque, and puts him on speakerphone so that Agent Howard can talk with Johnson. See Johnson Tr. at 39:13-23 (Balint). After some preliminaries, Agent Howard asks Johnson: "The process of becoming a vendor in Albuquerque, how did that -- was there a request for proposal?" Johnson Tr. at 48:21-23 (Howard). Johnson explains that, at first, Robotics Management "went through the administration and we were sole source because we had the only proprietary item for the software. In later years, it became an RFP.[2] An RFP was issued and we responded to it." Johnson Tr. at 49:2-6. The APS procurement department issued the RFP, asserts Johnson, and Stapleton had "nothing to do with the RFP." Johnson Tr. at 49:12-15 (Johnson).

Next, Agent Howard informs Johnson that "there is significant amounts of money going from the Robotics bank account to an entity controlled by Ms. Williams."[3] Johnson Tr. at 56:18-22 (Howard). Johnson replies: "No way. No way." Johnson Tr. at 56:23 (Johnson). He tells Agent Howard he has sent checks to Stapleton before, but he sends only "three or four" to her that are intended to pay for teachers that work at a youth summer program. Johnson Tr. at 59:18-24 (Johnson). Agent Howard then tells Johnson that around thirty-five percent "of the money that Robotics has made from APS has gone to Sheryl or to entities Sheryl controls," Johnson Tr. at 60:17-19 (Howard), because "Sheryl has been signing checks out of the Robotics account," id. at 64:4-6 (Howard). Johnson responds that he sends "[c]hecks. Not checkbooks," to Stapleton's after-school summer program, Johnson Tr. at 65:14-21 (Johnson); the checks he sends to

---

[2]For context and clarity, the Court notes that "RFP" stands for "Request for Proposal." See RFP Meaning: What Is an RFP and How to Write One, Adobe https://www.adobe.com/acrobat/business/resources/rfp-meaning.html?msockid=02edab9d2e26628e2111be412fed63d6 (last visited April 49, 2025).

[3]Occasionally, the Johnson Tr. refers to Stapleton as Ms. Williams. Throughout this opinion, the Court, however, refers to her as Stapleton.

Stapleton, however, are blank checks, because the "teachers work on an hourly basis," Johnson

Tr. at 66:2-6 (Johnson).

Agent Howard exerts pressure on Johnson, stating: "I don't think you're, you know, being

candid with us, in acting like you don't know how much money went to her different entities and

that it's improper for it to have come from Robotics."  Johnson Tr. at 67:18-22 (Howard).  The

agent adds that the "schedule of amounts" is "fairly consistent.  And it almost looks like agreed-

upon amounts, agreed-upon times."  Johnson Tr. at 69:8-10 (Howard).  Johnson replies: "That

never happened . . . it never happened from my perspective."  Johnson Tr. at 69:12-16 (Johnson).

Agent Howard tells him that Stapleton received $1.48 million from Robotics Management and

asserts that "Robotics is not a big enough company to have that much money walk out unnoticed."

Johnson Tr. at 70:21-23 (Howard).

Agent Howard then asks Johnson: "[W]as there the requirement, you know, to get the

business from APS, Sheryl renumerate her for it [sic]?"  Johnson Tr. at 71:7-9 (Howard)(Court

adds brackets).  Johnson replies: "There was never a requirement to pay Sheryl for the business.

Never."  Johnson Tr. at 71:24-25 (Johnson).  After additional back and forth, Johnson states: "I

don't know why she'd write those checks to her business.  They're not on my approval."  Johnson

Tr. at 78:3-4 (Johnson).

Johnson and Agent Balint examine some of the checks, and Johnson states to Agent

Howard: "What I've just done now is looked at some copies, and they don't have my signature."

Johnson Tr. at 84:5-9 (Johnson).  Agent Howard asks Johnson: "Does it sound like you [sic] that

Sheryl stole from you and from Robotics?"  Johnson Tr. at 86:6-7 (Howard)(Court adds brackets).

Johnson replies: "I really don't want to answer that question.  I mean, I think that's a foregone

conclusion."  Johnson Tr. at 86:8-10 (Johnson).  He continues: "I think Sheryl may have thought

-- I don't -- I don't want to answer that question.  I -- you know, I really don't know what her mind

thought [sic] was." Johnson Tr. at 86:13-16 (Johnson)(Court adds brackets).  "If she wrote checks

to the restaurant[4] out of the Robotics account," states Johnson, "she should not have done that.  I

don't want to characterize her as stealing from me.  But she should not have done that."  Johnson

Tr. at 87:7-10 (Johnson).  He adds: "I don't know what she's going to do, I don't know.  But she's

not going to implicate me as a partner in this or that we made that agreement."  Johnson Tr. at

90:18-20 (Johnson).

     Johnson states: "The facts are coming up to now that I was being misled somewhere else."

Johnson Tr. at 93:10-12 (Johnson).  Agent Howard asks Johnson how often he monitors Robotics

Management's accounts.  See Johnson Tr. at 98:10-13 (Howard).  Johnson tells Agent Howard

that:

> In the beginning, I had two people working for me . . . . One was Pat Smith, one
> was Andre Thompson.  They took care of the day-to-day stuff like that; I did
> not . . . But in the past, before these folks got sick and . . . I relied on them to do
> most of what you're just asking.

Johnson Tr. at 99:4-8 (Johnson); id. at 99:23-25 (Johnson).  He continues by stating that he was

unaware of Williams "getting money for Taste of [the] Caribbean[, her restaurant,] and S. Williams

& Associates[, her consulting business,] until" the FBI spoke with him.  Johnson Tr. at 100:15-23

(Johnson)(Court adds brackets).  Johnson maintains that "I really have not paid much attention at

all to this business, to be honest with you."  Johnson Tr. at 117:16-19 (Johnson).

     Agent Howard observes to Johnson that "I'm looking at you sort of as a victim in this right

now, based on what you're saying, because of your lack of knowledge of these transactions."

---

[4]For clarity, the Court notes that the United States alleges that Stapleton spent some of the
Robotics Management checks a restaurant she owns in Albuquerque, New Mexico, called Taste
of the Caribbean.  See Indictment ¶ 10, at 4, filed March 36, 2024 (Doc. 1).

Johnson Tr. 129:10-12 (Howard).  Agent Howard also notes, however, that "from the outside looking in at these transactions," Stapleton "would say, 'I want a taste on the back end.  Once you get the contract, this is how it's going to work."  Johnson Tr. at 131:16-24 (Howard).  Johnson responds: "I think she just took the liberty with this because I'm her friend to do this.  I think that's what she did."  Johnson Tr. at 132:5-6 (Johnson).  He adds: "And she had access to checks.  And I think she just took . . . the liberty to do it . . . just because she thought she could."  Johnson Tr. at 132:11-12 (Johnson); id. at 14-18 (Johnson).  After some additional discussion, the agents conclude the interview.  See Johnson Tr. at 155:1-25 (Johnson).

On August 4, 2021, the State of New Mexico files State of New Mexico's Notice of Seizure, In the Matter of: Bank of America Financial Accounts Belonging to: Robotics Management Learning System LLC; Ujima Foundation; Charlie Morrisey Foundation; S. Williams and Associates, D-202-CV-2021-04543 (State of New Mexico, Second Judicial District, County of Bernalillo)("Notice of Seizure").  See Notice of Seizure at 1.  On September 20, 2021, the New Mexico grand jury charges Stapleton with twenty-eight crimes associated with her alleged receipt of funds from Robotics.  See Indictment at 1-8 (dated September 17, 2021), State of New Mexico vs. Sheryl Williams Stapleton, No. D-202-CR-2021-01811 (State of New Mexico, Second Judicial District, County of Bernalillo).  On October 8, 2021, Johnson files the Declaration of Joseph F. Johnson (dated October 4, 2021), In the Matter of: Bank of America Financial Accounts Belonging to: Robotics Management Learning System LLC; Ujima Foundation; Charlie Morrisey Foundation; S. Williams and Associates,  No. D-202-CV-2021-04543 (State of New Mexico, Second Judicial District, County of Bernalillo)("Johnson Decl.").[5]

---

[5]The Johnson Decl. is attached as Exhibit A to Robotics Management Learning Systems LLC's Response to State of New Mexico's Notice of Intent to Forfeit Criminal Proceeds & Petition

The Johnson Decl. states that: "Robotics was a bona fide company providing educational services, including the CyberQuest software, to APS." Johnson Decl. ¶ 4, at 1. The Johnson Decl. also states that:

> Robotics had a contract with the University of New Mexico ("UNM") . . . . As part of this contract, Robotics administrated after school and summer programs for minority students in the Albuquerque area. Robotics would pay for the students' transportation, activities, and meals. In addition, Robotics would pay for the salaries of the teachers involved in the program.

Johnson Decl. ¶ 14, at 2. The Johnson Decl. continues: "This program was administered through the Charlie Morrisey Foundation, which is affiliated with UNM. In addition, the Ujima Foundation assisted with the administration of this program." Johnson Decl. ¶ 15, at 2. The Johnson Decl. maintains:

> As part of Robotics [Management's] administration of the summer program with UNM, Ms. Smith had possession of the Robotics checkbook, with checks to be drawn on Robotics [Management's] account at Bank of America (account number ending in 7636). These checks were to be used for necessary expenses for the summer program, including transportation, food, and activities.

Johnson Decl. ¶ 16, at 2. It continues: "I understood that these checks would be made out directly to the relevant vendors, or on occasion to the Charlie Morrisey Foundation or the Ujima Foundation, which would then pay the relevant vendors as part of their work on the summer program." Johnson Decl. ¶ 17, at 2.

The next paragraph states: "Ms. Smith, who along with Mr. Thompson was in charge of the day-to-day administration of the program, was always the custodian of the checkbook." Johnson Decl. ¶ 18, at 2. It continues: "I gave Ms. Smith permission to sign the checks with my

---

for Writ of Replevin, filed October 8, 2021, in In the Matter of: Bank of America Financial Accounts Belonging to: Robotics Management Learning System LLC; Ujima Foundation; Charlie Morrisey Foundation; S. Williams and Associates, No. D-202-CV-2021-04543 (State of New Mexico, Second Judicial District, County of Bernalillo).

name." Johnson Decl. ¶ 19, at 2.  It explains that Johnson believes that "Ms. Smith provided those

checks to [Stapleton] who had various roles in the administration of those summer and after school

programs.  Ms. Stapleton was to use those checks for the expenses for those programs."  Johnson

Decl. ¶ 20, at 2.  It asserts that Johnson did not authorize any checks to be written to S. Williams

& Associates, Stapleton's consulting business, or Taste of the Caribbean, Stapleton's restaurant.

Johnson Decl. ¶¶ 21-22, at 2-3.  It maintains that Johnson did not sign any of the checks "written

to the Charlie Morrisey Foundation, the Ujima Foundation, S. Williams and Associates, or Taste

of the Caribbean.  I believe that these checks were signed by either Ms. Smith or Ms. Stapleton."

Johnson Decl. ¶ 23, at 3.  Finally, it states that:

> I depended on my contractors, Ms. Smith and Mr. Thompson, to keep
> regular financial records of the incomes and expenditures of Robotics. I was not
> aware of the large amounts of money flowing from Robotics to the Charlie
> Morrisey Foundation, the Ujima Foundation, S. Williams and Associates, or
> Taste of the Caribbean until I was served with the Notice of Intent in this matter.

Johnson Decl. ¶ 24, at 3.

## **PROCEDURAL BACKGROUND**

On March 26, 2024, the Grand Jury: (i) charges Stapleton and Johnson with one count of

conspiracy to defraud the United States, in violation of 18 U.S.C.  § 371; (ii) charges Stapleton

with five counts of bribery concerning programs receiving federal funds, in violation of 18 U.S.C.

§ 666(a)(1)(B); charges Johnson with five counts of bribery concerning programs receiving federal

funds, in violation of 18 U.S.C. § 666(a)(2); (iii) charges Stapleton and Johnson with thirteen

counts of mail fraud and honest services fraud, in violation of 18 U.S.C. §§ 2, 1341, and 1346;

(iv) charges Stapleton with one count of fraud and false statements, in violation of 26 U.S.C.

§ 7206(1); (v) charges Stapleton and Johnson with nine counts of money laundering, in violation

of 18 U.S.C. §§ 2 and 1956(a)(1)(B)(i); and (vi) charges Stapleton and Johnson with one count of

conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956.  See Indictment ¶¶ 14-17, at 6-12, filed March 26, 2024 (Doc. 1); id. ¶¶ 18-19, at 12-13; id. ¶¶ 20-21, at 13-14; id. ¶¶ 22-25, at 14-16; id. ¶ 27, at 16-17; id. ¶ 28, at17-18; id. ¶ 29-31, at 18-20.

1.       **The Severance Motion.**

On December 5, 2024, Stapleton files her Severance Motion.  See Severance Motion at 1. The Severance Motion describes the FBI's interview with Johnson, stating: "During that investigation, Mr. Johnson stated that he was unaware of any of these kickback payments to Ms. Stapleton, and that he did not authorize payments to her organizations." Severance Motion at 2. Johnson's statements in the Johnson Decl., according to Stapleton, "attest to these statements" that Johnson makes to the FBI.  Severance Motion at 2.  Stapleton asserts that, "[e]ssentially, Mr. Johnson has accused Ms. Stapleton of stealing from him." Severance Motion at 2 (Court adds brackets).  According to Stapleton, Johnson's argument that Stapleton stole from him is a mutually antagonistic defense, because it "is a defense to the charges for Mr. Johnson," but it "unfairly prejudices Ms. Stapleton, who cannot confront and cross-examine Mr. Johnson about these accusations." Severance Motion at 2.  Stapleton contends that rule 14(a) of the Federal Rules of Criminal Procedure provides for severance if a joinder of defendants in an indictment prejudices a defendant.  See Severance Motion at 3 (quoting Fed. R. Crim. P. 14(a)).  She identifies Zafiro as the governing precedent, which states that a district court should grant a rule 14 severance "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence." Severance Motion at 3 (quoting Zafiro, 506 U.S. at 539).

Stapleton acknowledges, however, that Zafiro holds that mutually antagonistic defenses "are not prejudicial per se," Severance Motion at 3 (quoting Zafiro, 506 U.S. at 539): "[A] mere

conflict between defenses, or hostility among defendants may not be sufficient" to sever two defendants' trials, Severance Motion at 4.  Instead, the defenses' relationship must present the jury "with the proposition that to believe the core of one defense it must disbelieve the core of the other . . . or that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty."  Severance Motion at 4 (quoting Zafiro, 506 U.S. at 539).  According to Stapleton, the United States Court of Appeals for the Tenth Circuit looks to two out-of-Circuit cases as exemplars of "irreconcilable and mutually exclusive defenses mandating severance."  Severance Motion at 4 (citing United States v. Crawford, 581 F.2d 489 (5th Cir. 1978) and United States v. Johnson, 478 F.2d 1129 (5th Cir. 1973)).

Next, Stapleton summarizes what she believes will be Johnson's defense at trial.  See Severance Motion at 5.  She states that Johnson "appears to believe that Ms. Stapleton or Ms. Smith issued and signed each of the checks in question to Ms. Stapleton's organizations when Ms. Smith was suffering from medical conditions."  Severance Motion at 5.  Stapleton maintains that this defense is a mutually antagonistic defense, because Stapleton "cannot raise any argument about the payments being legitimate or otherwise address those payments while her codefendant is claiming that his payments to her were essentially fraudulently made solely on her own accord."  Severance Motion at 5.

Stapleton proceeds to argue that, if the Court does not sever her trial from Johnson's trial, her "Sixth Amendment protections for a fair trial will be compromised."  Severance Motion at 6.  She identifies two different situations that counsel for severance.  See Severance Motion at 6.  First, severance "should be considered if 'evidence the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a co-defendant.'"  Severance Motion at 6 (quoting Zafiro, 506 U.S. at 539).  Second, severance may be

warranted when defendants "are tried together in a complex case and they have markedly different degrees of culpability." Severance Motion at 6 (citing Kotteakos v. United States, 328 U.S. 750, 774-75 (1946)). Stapleton also cites United States v. Caldwell, 560 F.3d 1214, 1221 (10th Cir. 2009), for the proposition that "a defendant's burden to obtain severance is not satisfied based solely on a risk of guilt by association." Severance Motion at 6-7. She concludes that, in a joint trial, Stapleton would "defend against crimes alleged by both the government and her codefendant, where she would not be forced to defend such claims by her codefendant in a separate trial." Severance Motion at 7. She maintains that, in this case, Johnson "not only points the finger but adds an additional layer of criminality against him, with no recourse through cross-examination." Severance Motion at 7 (emphasis in original). Additionally, she contends that Johnson's out-of-court statements are admissible against her "in a joint trial" as "party-opponent" statements, pursuant to rule 801(d)(2) of the Federal Rules of Evidence, and, in contrast, the United States would have to call Johnson as a witness in her separate trial to introduce his statements to her jury. Severance Motion at 7.

Stapleton concludes by asserting that "Johnson has made multiple statements" that inculpate Stapleton "as to the charges raised by the government." Severance Motion at 7. Stapleton avers that, at a joint trial, she would not have the "opportunity to cross examine Mr. Johnson about those statements." Severance Motion at 10. She argues that her trial "must be severed to preserve her Confrontation rights under" Bruton. Severance Motion at 9.

### 2.    The United States' Response.

The United States files its Response in Opposition to Defendant Sheryl Stapleton's Motion to Sever on December 30, 2024 (Doc. 44)("Severance Response"). According to the United States, there are two problems with "Stapleton's clearest description of the antagonism of the defenses,"

i.e., that "'she cannot raise any argument about the payments being legitimate' in a joint trial with Johnson." Severance Response at 4 (quoting Severance Motion at 5). The first problem is that Stapleton "has not explained a defense to any of the charges in the indictment," and the second problem is that Stapleton can confront Johnson if he claims that she stole from him. Severance Response at 4. The United States maintains that "the indictment describes two layers of payments, each criminal for different reasons." Severance Response at 4. The first layer is the payments from APS to Robotics Management. See Severance Response at 4. The second layer is the payments from Robotics Management to Stapleton. See Severance Response at 4. The United States argues that, because "both defendants have equal incentive to argue that the payments from APS to Robotics" Management in the first layer "were legitimate," that "unity of interest, standing alone, weighs heavily in favor of the efficiency of a joint trial." Severance Response at 4. As to the second-layer payments, the United States asserts that Stapleton "has not explained what evidence" Stapleton "expects to present in support of her defense," and posits that the "paucity of her description of any prospective defense is a good indication of her intent to exercise her right to remain silent." Severance Response at 5. The United States declares that, if she invokes her right to remain silent, "it makes the likely trial indistinguishable from the properly-joined [sic] trial in Zafiro, in which two defendants remained silent while two defendants took the stand and inculpated the mute ones." Severance Response at 5.

Next, the United States discusses Johnson's statements and asserts that "Johnson's testimony against Stapleton would be no different from the testimony of any other witness against Stapleton, and would be no basis for separate trials," because "Stapleton will have a fair opportunity to confront and cross-examine him." Severance Response at 5. As to Bruton, the United States declares that it "has no intention of introducing Johnson's out-of-court statements

that he did not know about or authorize payments from Robotics to Stapleton." Severance Response at 5. The United States elaborates that it "does not credit Johnson's out-of-court statements -- he is a named defendant in this case" and that "[i]t is unclear why Stapleton thinks the United States would try to introduce such self-serving hearsay from Johnson in a trial against him." Severance Response at 5. The United States offers that, if Stapleton files a motion in limine to "exclude Johnson's statements that he did now know about or authorize payments from Robotics to Stapleton[,] the United States would join that motion if properly articulated." Severance Response at 5. The United States notes that severing the trials "simply because Johnson publicly professed his innocence while inculpating Stapleton would give every defendant the power to veto a joint trial by making a public statement that the co-defendant did the crime." Severance Response at 6. It concludes by arguing that a limiting construction can protect co-defendants' rights in joint trials. See Severance Response at 6.

**3.      The Reply.**

Defendant Sheryl Stapleton's Reply in Support of Motion for Severance of Defendant Joseph Johnson for Trial, filed January 27, 2025 (Doc. 46)("Reply"), argues that, in a joint trial, Stapleton will have to defend the United States' accusations of "government kickbacks" as well as Johnson's accusations that "the funds alleged to be kickbacks were funds stolen from Mr. Johnson." Reply at 2. Stapleton contends that an analogous case is United States v. Odom, 888 F.2d 1014 (4th Cir. 1989), in which the co-defendant's attack on the other defendant "was so unrelenting and prejudicial that Fincham could not have received a fair trial as a co-defendant and before the same jury as Odom." Reply at 2 (quoting United States v. Odom, 888 F.2d at 1018). She also contends that a United States Court of Appeals for the Fifth Circuit case, United States v. Johnson, 478 F.2d 1129 (5th Cir. 1973), counsels towards severance, because it provides an

example of entirely antagonistic defenses.  See Reply at 2.

Next, Stapleton expresses skepticism that the United States will not introduce Johnson's statements at trial.  See Reply at 4.  Stapleton asks the Court to hold a hearing during which the United States will introduce co-conspirator statements.  See Reply at 5.  Stapleton reiterates that the "Bruton issue risks prejudice sufficient to warrant severance."  Reply at 6.

### 4.    The Hearing.

At the hearing, the United States asserts that the "James issue is apparently moot," because the United States "does not have statements that it wishes to rely on the co-conspirator exception to the hearsay rule as its justification for admissibility."  Draft Tr. of Hearing at 7:8-19 (taken February 18, 2025 (Peña)("Tr.").[6]  Next, Stapleton argues that "the motion to sever is based on the Zafiro case," and explains that she submitted a motion "based on both the requirements of the mutually antagonistic defenses and the prejudices that would occur if Ms. Stapleton was to be tried in the same trial as her co-defendant."  Tr. at 15:2-10 (Assed).  Stapleton clarifies that Johnson's defense -- that Stapleton stole money from him -- is different from the United States' theory of the case, which is that "they both misappropriated funds" in "violation of federal laws."  Tr. at 16:20-23 (Assed).  She maintains that it is "an uncomfortable position for someone trying to fight for a fair trial contending with a federal indictment, and yet having another front to contend with, with Mr. Johnson's allegations."  Tr. at 20:11-15 (Assed).  According to Stapleton, she "would be forced to defend against" Johnson's theft allegation in a joint trial, because if "she sits here and doesn't say anything in defense of that allegation . . . that I believe will prejudice the jury with respect to her lack of testifying and defending herself."  Tr. at 21: 8-12 (Assed).

---

[6]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions.  Any final transcripts may have slightly different line or page numbers.

In response, the United States asserts that its "evidence against each defendant will be substantially identical." Tr. at 31:14-16 (Peña). The Court asks the United States if there is a reason why it would want to use Johnson's statements in the Johnson Decl., and the United States responds: "No, absolutely not." Tr. at 35:8-11 (Court)(Peña). Additionally, the Court confirms with the United States that "we don't have any <u>Bruton</u> statements here," and the United States responds, "Correct, sir." Tr. at 35:20-24 (Court)(Peña). The United States, moreover, states that it does not intend to use Johnson's FBI interview statements in its case-in-chief, either. <u>See</u> Tr. at 36:6-7 (Peña). The United States also maintains that this case is "essentially the identical situation as in <u>Zafiro</u> itself, in which the Supreme Court found that it was proper to hold a joint trial." Tr. at 37:16-19 (Peña).

Stapleton responds that she is "without a basis to believe that there is a third alternative possibility, other than she either was authorized or not authorized to take the money . . . . I don't know a third alternative that's supposedly not theft." Tr. at 50:23-51:1 (Assed); <u>id.</u> at 51:14 (Assed). The Court notes: "I'm not sure that you're ever going to be able to fully avoid Mr. Johnson. It's just a risk that we all have whether it's in the trial together or in a separate trial." Tr. at 52:6-9 (Court). Stapleton raises the concern that there might be a "mini trial about whether she embezzled from Mr. Johnson." Tr. at 55:7-10 (Assed). Finally, the United States contends that the "primary limiting instruction in joint trials is the stock instruction that tells the jury to evaluate the evidence against each defendant separately or independently." Tr. at 58:24-59:3 (Peña). The Court concludes the hearing by stating that, "at the present time, I'm not going to grant the motion to sever." Tr. at 65:9-10 (Court).

## LAW REGARDING RULE 8 JOINDER

Rule 8 of the Federal Rules of Criminal Procedure is the vehicle for joinder of both of

offenses and of defendants in a criminal proceeding.  Rule 8 provides:

> (a)    Joinder of Offenses.  The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged -- whether felonies or misdemeanors or both -- are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

> (b)    Joinder of Defendants.  The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses.  The defendants may be charged in one or more counts together or separately.  All defendants need not be charged in each count.

Fed. R. Crim. P. 8.  In the United States Court of Appeals for the Tenth Circuit, rule 8(b) governs the propriety of joinder of multiple defendants and their alleged offenses into one indictment.  See United States v. Eagleton, 417 F.2d 11, 14 (10th Cir. 1969)("Rule 8(a) . . . does not apply in cases where more than one defendant is joined in the same indictment.  Such joinder [of offenses] is governed by Rule 8(b).").   See also United States v. Mann, 701 F.3d 274, 289 (8th Cir. 2012)("Where an indictment joins defendants as well as offenses, the propriety of the joinder of offenses is governed by Rule 8(b), rather than Rule 8(a)."); United States v. Walker, 657 F.3d 160, 169 (3d Cir. 2011)("Rule 8(a) applies only to prosecutions involving a single defendant, and[,] in a multi-defendant case such as this, the tests for joinder of counts and defendants is merged in Rule 8(b)").  "Joint trials of defendants who are indicted together are preferred because 'they promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'"  United States v. Hall, 473 F.3d 1295, 1301-02 (10th Cir. 2007)(quoting Zafiro, 506 U.S. at 537).

Under rule 8(b), then, multiple defendants may be tried jointly "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. P. 8(b).  Rule 8(b), along with its phrase "same series of

acts or transactions," Fed. R. Crim. P. 8(b), "is construed broadly to allow liberal joinder to enhance the efficiency of the judicial system," United States v. Hopkinson, 631 F.2d 665, 668 (10th Cir. 1980).  In light of rule 8(b)'s broad construction, courts conclude that a conspiracy count -- albeit not necessary -- is sufficient to warrant joinder of all defendants charged in that conspiracy, regardless whether each defendant is charged in each count or with each substantive act.

> Although the Indictment in this case charged six different robberies alleged to have been committed by different defendants over a more than two-year period, it also alleged that the defendants conspired and agreed with each other to commit all six of the robberies.  Given the broad construction we afford Rule 8 and our preference for liberal joinder, this was sufficient to permit joinder.

 United States v. Hill, 786 F.3d 1254, 1272 (10th Cir. 2015).

## LAW REGARDING RULE 14(A) SEVERANCE

Pursuant to rule 14(a) of the Federal Rules of Criminal Procedure, a court may "order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires" if joinder "appears to prejudice a defendant."  Fed. R. Crim. P. 14(a).  Rule 14(a) envisions situations where a joint trial would be inappropriate and harmful to the accused's Constitutional rights even though joinder is proper under rule 8, which is liberally and broadly applied in the interest of efficiency.  See Zafiro, 506 U.S. at 538 (using rule 14 as the standard for severance); United States v. Cox, 934 F.2d 1114, 1119 (10th Cir. 1991)(applying rule 14 to set the standard for severance).  The decision to sever is "within the sound discretion of the trial court." United States v. Cox, 934 F.2d at 1119 (citing United States v. Valentine, 706 F.2d 282, 289-90 (10th Cir. 1983)).  See United States v. Gant, 487 F.2d 30, 34 (10th Cir. 1973)(noting that severance "is peculiarly within the discretion of the trial court")(citing United States v. Austin, 462 F.2d 724, 733 (10th Cir. 1972); United States v. Troutman, 458 F.2d 217, 221 (10th Cir. 1972);

8 Moore's Federal Practice ¶ 14.04; and <u>Lowther v. United States</u>, 455 F.2d 657 (10th Cir. 1972)).

"Inasmuch as severance is a matter of discretion and not of right, the defendant must bear a heavy burden of showing real prejudice to his case." <u>United States v. Hall</u>, 473 F.3d at 1302 (quoting <u>United States v. McConnell</u>, 749 F.2d 1441, 1444 (10th Cir. 1984)). "Joint trials of defendants who are indicted together are preferred, because 'they promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" <u>United States v. Hall</u>, 473 F.3d at 1301-02 (quoting <u>Zafiro</u>, 506 U.S. at 537). Additionally, "a criminal defendant has no constitutional right to severance unless there is a strong showing of prejudice caused by a joint trial." <u>Cummings v. Evans</u>, 161 F.3d 610, 619 (10th Cir. 1998)(citing <u>United States v. Youngpeter</u>, 986 F.2d 349, 353 (10th Cir. 1993)). The prejudice standard that rule 14 envisions thus requires a showing of actual prejudice, and not merely a showing that a defendant "may have a better chance of acquittal in separate trials." <u>United States v. Pursley</u>, 474 F.3d 757, 766 (10th Cir. 2007). To establish prejudice, a defendant must identify a "'specific trial right' that was compromised or show the jury was 'prevented . . . from making a reliable judgment about guilt or innocence.'" <u>United States v. Pursley</u>, 474 F.3d at 766 (quoting <u>Zafiro</u>, 506 U.S. at 539). Significantly, "[r]ule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." <u>Zafiro</u>, 506 U.S. at 538-39.

In interpreting rule 14, United States Courts of Appeals have explored whether the risk of "mutually antagonistic" or "irreconcilable" defenses may supply the prejudice needed in some circumstances as to warrant severance. <u>Zafiro</u>, 506 U.S. at 538 (citing, <u>e.g.</u>, <u>United States v. Benton</u>, 852 F.2d 1456, 1469 (6th Cir. 1988); <u>United States v. Smith</u>, 788 F.2d 663, 668 (10th Cir. 1986); <u>United States v. Magdaniel-Mora</u>, 746 F.2d 715, 718 (11th Cir. 1984); <u>United States v.</u>

Berkowitz, 662 F.2d 1127, 1133-1134 (5th Cir. 1981); United States v. Haldeman, 559 F.2d 31,

71-72 (D.C. Cir. 1976)).   The Tenth Circuit, in United States v. Pursley, holds that when a

defendant seeks severance because of mutually antagonistic defenses among co-defendants,

> a trial court engages in a three step inquiry.  First, it must determine whether the
> defenses presented are "so antagonistic that they are mutually exclusive."  United
> States v. Peveto, 881 F.2d 844, 857 (10th Cir. 1989).  Second, because "[m]utually
> antagonistic defenses are not prejudicial per se," a defendant must further show "a
> serious risk that a joint trial would compromise a specific trial right . . . or prevent
> the jury from making a reliable judgment about guilt or innocence."  Zafiro v.
> United States, 506 U.S. [at] 539[].  Third, if the first two factors are met, the trial
> court exercises its discretion and "weigh[s] the prejudice to a particular defendant
> caused by joinder against the obviously important considerations of economy and
> expedition in judicial administration."  Peveto, 881 F.2d at 857.

United States v. Pursley, 474 F.3d at 765.  In a court's consideration of such a scenario, "defenses

are mutually antagonistic if 'the conflict between codefendants' defenses [is] such that the jury, in

order to believe the core of one defense, must necessarily disbelieve the core of the other.'"  United

States v. Pursley, 474 F.3d at 765 (quoting United States v. Linn, 31 F.3d 987, 992 (10th Cir.

1994)).  The defendants must show that "'the acceptance of one party's defense would tend to

preclude the acquittal of the other, or that the guilt of one defendant tends to establish the innocence

of the other.'"  United States v. Pursley, 474 F.3d at 765-66 (quoting United States v. Peveto, 881

F.2d at 857).

Ultimately, a trial court that denies a request for severance will be reversed only when a

defendant demonstrates an abuse of discretion.  See United States v. Pursley, 474 F.3d at 765.  In

exercising its discretion, however, the trial court should "weigh the prejudice resulting from a joint

trial of co-defendants against the expense and inconvenience of separate trials."  United States v.

Bailey, 952 F.2d 363, 365 (10th Cir. 1991)(quoting United States v. Cardall, 885 F.2d 665, 667-

68 (10th Cir. 1989)).  "Neither a mere allegation that defendant would have a better chance of

acquittal in a separate trial, nor a complaint of the 'spillover effect' from the evidence that was

overwhelming or more damaging against the co-defendant than that against the moving party is

sufficient to warrant severance." United States v. Bailey, 952 F.2d at 365 (quoting United States

v. Cardall, 885 F.2d at 667-68). A defendant seeking severance bears the "heavy burden" of

demonstrating a risk of prejudice from continued joinder. United States v. Bailey, 952 F.2d at 365

n.4 (citing United States v. Jones, 707 F.2d 1169, 1171 (10th Cir. 1983); and United States v.

Petersen, 611 F.2d 1313, 1331 (10th Cir. 1979)). The Supreme Court of the United States states:

> Such a risk might occur when evidence that the jury should not consider against a
> defendant and that would not be admissible if a defendant were tried alone is
> admitted against a codefendant. For example, evidence of a codefendant's
> wrongdoing in some circumstances erroneously could lead a jury to conclude that
> a defendant was guilty. When many defendants are tried together in a complex case
> and they have markedly different degrees of culpability, this risk of prejudice is
> heightened. Evidence that is probative of a defendant's guilt but technically
> admissible only against a codefendant also might present a risk of prejudice.
> Conversely, a defendant might suffer prejudice if essential exculpatory evidence
> that would be available to a defendant tried alone were unavailable in a joint trial.
> The risk of prejudice will vary with the facts in each case, and district courts may
> find prejudice in situations not discussed here. When the risk of prejudice is high,
> a district court is more likely to determine that separate trials are necessary, but, as
> we indicated in Richardson v. Marsh, [481 U.S. 200 (1987)] less drastic measures,
> such as limiting instructions, often will suffice to cure any risk of prejudice.

Zafiro v. United States, 506 U.S. at 539 (citing Richardson v. Marsh, 481 U.S. at 211).

With respect to a district court's application of rule 14 in practice, particularly in the context

of multi-count and multi-defendant indictments, one district court explains:

> Most often, severance of defendants will be required to protect the rights of
> defendants against undue prejudice resulting from joinder. In other situations,
> severance may be required, or at least the argument for severance will be bolstered,
> by the physical limitations of the courthouse and the logistical difficulties of
> attempting to conduct a complex multi-defendant trial.

United States v. Gray, 173 F. Supp. 2d 1, 7-8 (D.D.C. 2001)(Lamberth, J.). Another district court

addresses the possibility of prejudicial joinder of the defendants

> deriving from the number of defendants and the number of counts, the complexity of the indictment, estimated length of the trial, disparities in the amount or type of proof offered against the defendants, disparities in the degrees of involvement by defendants in the overall scheme, possible conflict between various defense theories or trial strategies; and, especially, prejudice from evidence admitted only against co-defendants but which is inadmissible or excluded as to a particular defendant.

United States v. Gallo, 668 F. Supp. 736, 749 (E.D.N.Y. 1987)(Weinstein, C.J.).  The United States v. Gray court explains that, in United States v. Gallo, "[a]fter weighing the potential prejudice against defendants, the court decided that the dispositive factor counseling severance was judicial efficiency."  United States v. Gray, 173 F. Supp. 2d at 8-9 (citing United States v. Gallo, 668 F. Supp. at 753).  Indeed, the United States v. Gray court states that "[m]any of the factors that counseled against complete joinder of defendants [in United States v. Gallo] are also persuasive in the instant case," and concludes

> that despite the general presumption favoring joinder, some form of severance is necessary because of the physical limitations of the courtroom and hardship on the jurors, the defendants, and the Court.  Severance, however, should be of the most limited form necessary to satisfy those interests, because the Court finds that joinder of defendants, to the extent possible, will preserve judicial resources and permit the jury to have as complete a view of the evidence as possible.

United States v. Gray, 173 F. Supp. at 10.  Accordingly, the United States v. Gray court severs a "158-count [Indictment]" charging "seventeen defendants" into two trial groupings based on logistical concerns alone.  United States v. Gray, 173 F. Supp. at 1, 10.  The United States v. Gray court also considers that

> [s]everal defendants have moved for complete severance or other joint trial configurations based on Rule 14 concerns of prejudice against defendants.  In order to prevail upon a claim for severance, [those] defendant[s] must show that joinder would violate that defendant's constitutional fair trial rights, or would "prevent the jury from making a reliable judgment about guilt or innocence."

United States v. Gray, 173 F. Supp. at 10 (quoting Zafiro v. United States, 506 U.S. at 539).

Although the United States v. Gray court already had severed the defendants into two trial groupings to alleviate the risk of prejudice to the defendants by logistical inefficiency and impracticality, the court still was open to requests for severance of individual defendants upon a specific showing that joinder in either of the trial groupings still ran afoul of Zafiro v. United States and rule 14. See United States v. Gray, 173 F. Supp. at 10. The United States v. Gray court ultimately concludes that. in severing that case's defendants into two trial groupings, its chosen "arrangement of the defendants appears to be, at least on the information now available, the most efficacious in preserving judicial resources, preventing duplicitous testimony and evidence, and reaching an expeditious resolution for all defendants." United States v. Gray, 173 F. Supp. at 18.

Recently, the Court addressed a joinder argument in United States v. DeLeon, No. CR 15-4268 JB, *41 (D.N.M. 2021 Dec. 29, 2021)(Browning, J.)("DeLeon"). In DeLeon, the United States asks the Court to consolidate several defendants' trials pursuant to rule 13 of the Federal Rules of Civil Procedure; the United States alleges that the defendants committed crimes as members of the Sindicato Nuevo Mexico ("SNM"), a violent New Mexico prison gang. See DeLeon, 2021 WL 6134696, at *1. In support of its position, the United States "emphasizes" several "commonalities that connect the Defendants' cases." DeLeon, 2021 WL 6134696, at *2. First, the United States contends that the Defendants "are alleged members" of SNM, who "knowingly and intentionally participated" SNM's affairs. DeLeon, 2021 WL 6134696, at *2. Second, the United States explains that it "plans to rely on common evidence to prove the Defendants' guilt," because the indictment charges the Defendants under racketeering statutes. DeLeon, 2021 WL 6134696, at *2.

The Court applies Zafiro and concludes that "the possible prejudicial effect that a consolidated trial might have on the Defendants outweighs any increased efficiency benefits."

DeLeon, 2021 WL 6134696, at *40.  "Consolidating the Defendants' trials," states the Court,

"could create a risk that 'the jury would lump all defendants together and potentially think of them

as a unit, rather than as individuals.'"  DeLeon, 2021 WL 6134696, at *41.  The Court concludes

that, if this happened, it would prejudice the Defendants: "Because the Defendants are charged

with almost entirely distinct offenses, some of the evidence presented against each Defendant is

likely to be irrelevant to the other Defendants."  DeLeon, 2021 WL 6134696, at *41 (citing Fed.

R. Evid. 401).  The Court goes on to observe that "[t]here is a risk, therefore, that a jury will treat

any evidence of the Defendants' alleged crimes as character evidence that shows the Defendants

are collectively guilty by virtue of their alleged association with SNM."  DeLeon, 2021 6134696,

at * 41 (citing Fed. R. Evid. 404).  While the Court recognizes that "a court must consolidate before

it can sever," the Court "concludes that the risk that a consolidated trial could prejudice

Defendants' fair-trial rights outweighs any possible judicial efficiency benefits, and would create

a risk, however small, that a jury might not make a reliable judgment about the Defendants' guilt

or innocence."  DeLeon, 2021 WL 6134696, at  *41 (citing United States v. Hollis, 971 F.2d 1441,

1456 (10th Cir. 1992)).

## LAW REGARDING THE CONFRONTATION CLAUSE

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal

prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

him."  U.S. Const. amend. VI.  In Crawford v. Washington, the Supreme Court holds that,

consistent with the Sixth Amendment, "[t]estimonial [hearsay] statements of witnesses absent

from trial [are admissible] only where the declarant is unavailable, and only where the defendant

has had a prior opportunity to cross-examine."  541 U.S. 36, 59 (2004)(Scalia, J.).  In Davis v.

Washington, 547 U.S. 813 (2006)(Scalia, J.), the Supreme Court further elaborates on what

constitutes a "testimonial" statement:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. at 822. See Ohio v. Clark, 576 U.S. 237, 245 (2015)(Alito, J.)("[A] statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial."). The Tenth Circuit restates this rule, defining a testimonial statement as "a 'formal declaration made by the declarant that, when objectively considered, indicates' that the 'primary purpose of the [statement is] to establish or prove past events potentially relevant to later criminal prosecution.'" United States v. Morgan, 748 F.3d 1024, 1048 (10th Cir. 2014)(quoting United States v. Smalls, 605 F.3d 765, 777-78 (10th Cir. 2010))(brackets in United States v. Morgan). Accord United States v. Chaco, 801 F. Supp. 2d 1200, 1209-10 (D.N.M. 2011)(Browning, J.)(discussing developments in Tenth Circuit precedent on the test regarding what qualifies as a testimonial statement).

In Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009)(Scalia, J.), the Supreme Court addresses whether admitting a forensic chemist's affidavit, which states that the substance that police seized from the defendant is cocaine of a certain amount, violates the Confrontation Clause. See 557 U.S. at 307. The Supreme Court first concludes that such affidavits are testimonial, because they are "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" and because, under Massachusetts law, the sole purpose of the affidavit is to provide prima facie evidence of the content of the substance seized. 557 U.S. at 310. The Supreme Court then uses the affidavit that

the prosecution introduces to outline its concerns regarding the lack of cross-examination when such affidavits are introduced as evidence:

> The affidavits submitted by the analysts contained only the bare-bones statement that "[t]he substance was found to contain: Cocaine."  At the time of trial, petitioner did not know what tests the analysts performed, whether those tests were routine, and whether interpreting their results required the exercise of judgment or the use of skills that the analysts may not have possessed.  While we still do not know the precise tests used by the analysts, we are told that the laboratories use "methodology recommended by the Scientific Working Group for the Analysis of Seized Drugs[.]"  At least some of that methodology requires the exercise of judgment and presents a risk of error that might be explored on cross-examination.

557 U.S. at 320.  Because there is no opportunity to cross-examine on these issues, the Supreme Court concludes that introduction of the affidavit violates the defendant's rights under the Confrontation Clause.   See 557 U.S. at 329 ("The Sixth Amendment does not permit the prosecution to prove its case via ex parte out-of-court affidavits, and the admission of such evidence against Melendez-Diaz was error.").  The Supreme Court has since extended this holding to "forensic laboratory report[s] containing a testimonial certification -- made for the purpose of proving a particular fact -- through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification."   Bullcoming v. New Mexico, 564 U.S. 647, 661 (2011)("Accordingly, the analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa.'" (quoting Melendez-Diaz v. Massachusetts, 557 U.S. at 319 n.6)).  The Court has evaluated Confrontation Clause issues several times.  See United States v. Salas-Aguayo, No. CR 12-3109 JB, 2024 WL 453642, at *21 (D.N.M. Feb. 6, 2024)(Browning, J.)(concluding that the Confrontation Clause does not bar co-conspirator statements, non-hearsay, or statements that were not made for use in the investigation or prosecution of a crime); United States v. DeLeon, 558 F. Supp. 3d 1105, 1125 (D.N.M.

2021)(Browning, J.)(concluding that a statement made from one inmate to another in a prison recreation yard is not testimonial, because the statement was not given to law enforcement, and there is no indication the declarant intended to create a record for trial or other proceeding); United States v. Chapman, No. CR 14-1065 JB, 2015 WL 4042177, at *26-29 (D.N.M. June 29, 2015)(Browning, J.)(concluding that prohibiting a defendant from cross-examining a witness about an uncharged alleged theft does not violate the Confrontation Clause).

### LAW REGARDING CO-DEFENDANTS' STATEMENTS AND THE CONFRONTATION CLAUSE AFTER CRAWFORD V. WASHINGTON: BRUTON V. UNITED STATES AND NONTESTIMONIAL HEARSAY

Bruton, 391 U.S. 123, holds that, in a joint trial, a defendant's Sixth Amendment confrontation right is violated, regardless of any limiting instruction that might be given to the jury, by admitting the confession of a non-testifying codefendant that implicates the defendant. See 391 U.S. at 128.  In Bruton, George Bruton and William Evans are tried jointly for robbery, and, upon his arrest, Evans gives a confession to a postal inspector, in which he admits that he and Bruton committed the robbery.  See 391 U.S. at 124.  At trial, the prosecution introduces Evans' confession, and the trial court -- perhaps recognizing that the evidence might pose a problem -- gives a limiting instruction charging the jury that it was not to consider Evans' confession "in any respect to the defendant Bruton." 391 U.S. at 125.  Both Bruton and Evans are convicted, but the Supreme Court holds that it is Constitutional error to admit into evidence the incriminating statement which Evans makes and which implicates Bruton; according to the Supreme Court, a limiting instruction does not cure this error.  See 391 U.S. at 128.  The Supreme Court notes that a co-defendant's confession is admissible under hearsay rules only against the confessing co-defendant, which is why the Supreme Court contemplates whether a limiting instruction satisfactorily can cure the problem by instructing jurors to ignore the confession in determining a

non-confessing co-defendant's guilt or innocence. See 391 U.S. at 128 n.3 ("We emphasize that the hearsay statement inculpating petitioner was clearly inadmissible against him under traditional rules of evidence, . . . the problem arising only because the statement was . . . admissible against the declarant."). The Supreme Court states

> there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect . . . . The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination.

391 U.S. at 135-36. The Supreme Court also states:

> If it is a denial of due process to rely on a jury's presumed ability to disregard an involuntary confession, it may also be a denial of due process to rely on a jury's presumed ability to disregard a codefendant's confession implicating another defendant when it is determining that defendant's guilt or innocence.

391 U.S. at 130-31. Ultimately, Bruton holds that there is a substantial threat that the jury will ignore a limiting instruction and use the co-defendant's confession as evidence of the other non-confessing defendant's guilt, and, thus, such confessions are inadmissible unless the codefendant testifies. See 391 U.S. at 137.

The Supreme Court subsequently explores its Bruton doctrine in Richardson v. Marsh, 481 U.S. at 200, and Gray v. Maryland, 523 U.S. at 195. In Richardson v. Marsh, Clarissa Marsh, Benjamin Williams and Kareem Martin face murder charges. See 481 U.S. at 202. Both Marsh and Williams are tried jointly, but Williams does not testify at the joint trial. See 481 U.S. at 202, 204. At trial, the prosecution introduces evidence of Williams' confession by which he implicates Marsh and Martin, as well as himself. See 481 U.S. at 203-04. The trial court redacts the

confession to remove references to Marsh, and "omitted all indication that anyone other than Martin and Williams participated in the crime." 481 U.S. at 203. The trial court also instructs the jury to "not use [Williams' confession] in any way against [Marsh]." 481 U.S. at 204. The Supreme Court ultimately concludes that the trial court does not err by admitting Williams' confession as it had been redacted, because "the confession was not incriminating on its face." 481 U.S. at 208. Accordingly, the Supreme Court affirms that redaction can satisfy Bruton. See Richardson v. Marsh, 481 U.S. at 209 (referring to Bruton, 391 U.S. at 134 n.10).

In Gray v. Maryland, Anthony Bell and Kevin Gray are tried jointly for murder. See Gray v. Maryland, 523 U.S. at 188. After Bell is arrested, he tells the police that he, Gray, and a third person were responsible for the victim's death. See Gray v. Maryland, 523 U.S. at 188. At Bell and Gray's joint trial, the trial court permits the prosecution to introduce a redacted version of Bell's confession. See 523 U.S. at 188. The detective who testifies about Bell's confession said "deleted" or "deletion" whenever the name of Gray or the third participant appeared. 523 U.S. at 188. Immediately thereafter, however, the detective testifies that the police arrest Gray only upon Bell's confession. See 523 U.S. at 189. The government introduces a written copy of Bell's confession with the names of Gray and the third person having been replaced with blank spaces that are separated by commas. See 523 U.S. at 189. The court also instructs the jury that Bell's confession cannot be used as evidence against Gray. See 523 U.S. at 189.

The Supreme Court acknowledges that Richardson v. Marsh holds that the admission of co-defendant confessions that are redacted to remove any reference to the existence of the other defendants does not violate Bruton v. United States. See Gray v. Maryland, 523 U.S. at 190-91. The Supreme Court notes, however, that, unlike the redacted confession in Richardson v. Marsh, the confession in Gray v. Maryland references the existence of the non-confessing defendant,

because the government merely replaces Gray's name with the word "deleted" or a blank space. Gray v. Maryland, 523 U.S. at 192.  The Supreme Court concludes that a redaction that replaces a defendant's name with an obvious indication of deletion falls within Bruton's purview, because "[r]edactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration . . . so closely resemble Bruton's unredacted statements that, in our view, the law must require the same result."  Gray v. Maryland, 523 U.S. at 189.

Then came Crawford v. Washington.    In Crawford v. Washington, the Supreme Court holds that that the Confrontation Clause is violated when hearsay is "testimonial" and admitted against a criminal defendant, and the hearsay declarant does not testify at the defendant's trial, unless (i) the declarant was unavailable for trial, and (ii) the defendant was previously able to cross-examine the declarant.  See Crawford v. Washington, 541 U.S. at 59-61.  This holding necessarily implicates the logic underlying Bruton, because, to the extent that Bruton protects the rights afforded to criminal defendants under the Confrontation Clause, Crawford v. Washington makes clear that the Confrontation Clause protects only against testimonial hearsay that is admitted against a defendant absent the opportunity to cross-examine the declarant.  See 541 U.S. at 59-61. With respect to what such a "testimonial" statement might be, however, the Supreme Court in Crawford v. Washington does not provide a definition to differentiate "testimonial" from "non-testimonial" hearsay, and instead notes only that "various formulations" or "articulations" or "definitions" of "testimonial" can be posited; and, apart from citing examples of statements that would qualify as testimonial under any definition, the Supreme Court specifically declines to undertake crafting a controlling definition of "testimonial."  541 U.S. at 51-53.  The Supreme Court reiterates that it is not providing a definition for "testimonial": "[W]e leave for another day

any effort to spell out a comprehensive definition of 'testimonial.'" Crawford v. Washington, 541 U.S. at 68. The Supreme Court provides, however, that co-defendants' statements to fellow prisoners are not testimonial, meaning they do not fall under the purview of the Confrontation Clause after Crawford v. Washington. See Davis v. Washington, 547 U.S. at 825 (providing that statements from one prisoner to another are "clearly" not testimonial).

Since Crawford v. Washington, many Courts of Appeals have, accordingly, superseded Bruton v. United States' analysis with Crawford v. Washington's. That is, Courts of Appeals have held that Crawford v. Washington limits Bruton v. United States to protect co-defendants only from testimonial statements. See United States v. Castro-Davis, 612 F.3d 53, 65 (1st Cir. 2010)(holding that the defendant's recorded telephone statements to his mother were non-testimonial); United States v. Dale, 2010 WL 2977410, at *9 (8th Cir. 2010)(holding that the defendant's statements to prisoner are not testimonial and therefore do not violate co-defendant's Confrontation Clause rights); United States v. Smalls, 605 F.3d at 768 n.2 ("[T]he Bruton rule, like the Confrontation Clause on which it is premised, does not apply to nontestimonial hearsay statements."); United States v. Johnson, 581 F.3d 320, 326 (6th Cir. 2009)(holding that, because Bruton is based on the Confrontation Clause, then the Confrontation Clause also applies only to testimonial statements, and any non-testimonial statement is not subject to the Confrontation Clause); United States v. Pike, 292 F. App'x 108, 112 (2d Cir. 2008)("[B]ecause the statement was not testimonial, its admission does not violate either Crawford or Bruton."). Some federal courts conclude otherwise, however, and continue to apply Bruton to nontestimonial statements despite Crawford v. Washington. See United States v. Ramos-Cardenas, 524 F.3d 600, 609-10 (5th Cir. 2008)(holding that, although the co-defendant's statements are nontestimonial, because

they are entered against the declarant, Bruton governs the analysis and not Crawford v. Washington); United States v. Williams, 2010 WL 3909480 (E.D. Va. 2010)(Cacheris, J.).

Although the weight of precedent counsels otherwise, the Court pauses to discuss the conclusion in United States v. Williams, a non-binding, out-of-Circuit opinion. United States v. Williams involves three co-defendants who are charged with conspiracy to distribute crack cocaine, intentional killing while engaged in drug trafficking, and use of a firearm during a drug offense relating in death. See 2010 WL 3909480, at *1. The defendants allegedly make statements to several witnesses incriminating both themselves and their co-defendants, and the United States intends to introduce those statements at their joint trial. See United States v. Williams, 2010 WL 3909480, at *1. The Honorable James C. Cacheris, United States District Judge for the Eastern District of Virginia, concludes that, while the Supreme Court in Crawford v. Washington holds that the Confrontation Clause covers testimonial hearsay, it does not hold that the Clause exclusively covers only testimonial hearsay. See United States v. Williams, 2010 WL 3909480, at *2-3 (citing Crawford v. Washington, 541 U.S. at 60-61). Judge Cacheris reasons that it is "highly unlikely that Crawford (a case that expanded the Confrontation Clause's application) would have eviscerated Bruton (a Confrontation Clause case that Crawford cited) so casually." United States v. Williams, 2010 WL 3909480, at *4. Thus, Judge Cacheris holds that Bruton still can apply to the co-defendants' statements at issue in that case and bar their introduction regardless whether they were non-testimonial. See United States v. Williams, 2010 WL 3909480, at *4.[7]

---

[7]Some academics agree.

[T]here are two possible interpretations of the scope of the Bruton doctrine in the wake of Crawford and its progeny -- and that each should preclude the admission of nontestimonial codefendant confessions. The first is that Crawford, like its predecessor, had nothing to say about the inadmissibility of

The Tenth Circuit has foreclosed the analysis underlying <u>United States v. Williams</u> and instead dictates the Court's inevitable conclusion that <u>Crawford v. Washington</u> limits <u>Bruton</u>'s scope to co-defendants' testimonial statements.  <u>See</u> <u>United States v. Smalls</u>, 605 F.3d at 768 n.2. In <u>United States v. Smalls</u>, the Tenth Circuit considers a case where Glenn Dell Cook, Walter Melgar-Diaz, and Paul Othello Smalls are charged with of killing Phillip Gantz, a jailhouse informant.  <u>See</u> 605 F.3d at 767-68.  Gantz had been helping federal drug enforcement officials with their investigations, and was housed in the same unit as Cook, Melgar-Diaz, and Smalls.  <u>See</u> 605 F.3d at 767-68.  Prison guards record Cook implicating his co-defendant Smalls in a confession regarding the murder to a fellow inmate and confidential informant.  <u>See</u> 605 F.3d at 767-68.  Relying on <u>Bruton v. United States</u>, the district court severed the two defendants' trials, because it concludes that Cook's statement cannot be introduced against Smalls.  605 F.3d at 768 n.2.  The United States nonetheless moves to admit this statement against Smalls in his separate trial, arguing that the statement was made against Cook's penal interests.  <u>See</u> 605 F.3d at 772-73. The district court concludes that Cook's statement is non-testimonial and then "analyzed the admissibility of Cook's statement under the framework of the Supreme Court's Confrontation

---

codefendant confessions under the <u>Bruton</u> doctrine, meaning that courts should find that even nontestimonial codefendant statements can violate the doctrine. The second is that <u>Crawford</u> deconstitutionalized the <u>Bruton</u> doctrine, meaning that nontestimonial codefendant statements do not violate the Confrontation Clause.   In this case, however, courts should readily find that such nontestimonial codefendant statements violate Federal Rule of Evidence 403 and are therefore inadmissible anyway.

Colin Miller, <u>Avoiding A Confrontation? How Courts Have Erred in Finding That Nontestimonial Hearsay Is Beyond the Scope of the Bruton Doctrine</u>, 77 Brook. L. Rev. 625, 661 (2012).  The Court reiterates, however, that the Tenth Circuit has reached a different conclusion.  <u>See United States v. Smalls</u>, 605 F.3d at 768 n.2.

Clause jurisprudence as set forth in Ohio v. Roberts," thereafter concluding that the statement lacks

a "particularized guarantee of trustworthiness," and that the court should exclude the statement.

United States v. Smalls, 605 F.3d at 772-73.

The Tenth Circuit reverses the district court. See 605 F.3d at 773-74. The Tenth Circuit

concludes that, if Cook's statement is testimonial, its exclusion would have been proper, but,

because the statement was non-testimonial, the Confrontation Clause's protections do not apply.

See 605 F.3d at 787. The Tenth Circuit reasons that, if the statement meets the definition for

"statements against interest" under rule 804(b)(3) of the Federal Rules of Evidence, it is admissible

against Smalls. 605 F.3d at 780. The Tenth Circuit, accordingly, holds that the district court errs

in excluding the entire statement, and it remands the case to determine exactly which parts of the

statement were self-inculpatory and therefore admissible. See 605 F.3d at 786-87. Notably, in

reaching this conclusion, the Tenth Circuit also provides:

> Although the district court's severance order is not part of the record on
> appeal, we take judicial notice of it under Fed. R. Evid. 201 as it appears of record
> in United States v. Smalls, No. 06-CR-2403-RB-1, Memorandum Opinion and
> Order (D.N.M. May 7, 2008)(Doc. # 280). Relying on Bruton v. United States, 391
> U.S. 123 [] and its progeny, the district court reasoned the admission into evidence
> of a recorded statement in which Cook incriminated both himself and his alleged
> cohorts before a CI would violate Defendant Smalls' right to confrontation. In
> Bruton, the Court held that defendant was deprived of his Sixth Amendment right
> to confrontation where his accomplice's confession, made to a postal inspector
> during an interrogation, was introduced at their joint trial. The Court explained that
> a limiting jury instruction was insufficient under the facts of the case to cure any
> prejudice to that defendant. As will become apparent from our opinion, Bruton is
> consistent with the present state of Sixth Amendment law because the accomplice's
> confession, unlike Cook's statement, was testimonial, rendering it inadmissible
> against the defendant absent an opportunity for cross-examination. Notably,
> however, the Bruton rule, like the Confrontation Clause upon which it is premised,
> does not apply to nontestimonial hearsay statements.

United States v. Smalls, 605 F.3d at 768 n.2. In the Tenth Circuit, after United States v. Smalls, it

is clear that Crawford v. Washington limits Bruton v. United States and now protects against the

admission only of co-defendants' testimonial statements.  See United States v. Smalls, 605 F.3d at 768 n.2.

The Court recently addresses Bruton in United States v. DeLeon, 287 F. Supp. 3d 1187 (D.N.M. 2018).  In United States v. DeLeon, the Court notes that, on a clean slate, "the Court would, thus, conclude that Bruton['s] language regarding the efficacy of limiting instructions applies no matter whether an evidentiary rule or a constitutional one renders a defendant's out-of-court statements inadmissible against codefendants."  287 F. Supp 3d at 1261.  The Court also observes: "[E]xamination of Tenth Circuit precedent shows that the Tenth Circuit's statements are dicta, because none of them analyzed a defendant statement that was nontestimonial and not admissible, under the Federal Rules of Evidence, against a codefendant which the statement implicated."  287 F. Supp. 3d at 1262.  The Court acknowledges that, if the Tenth Circuit faces squarely the issue, the "Tenth Circuit may decide that the Court took" its Bruton precedents "too literally, and instead apply Supreme Court precedent to limit their unnecessarily overbroad pronouncements regarding the application of Bruton[] to nontestimonial statements."  287 F. Supp. 3d at 1262.  However, the Court concludes that until the Tenth Circuit addresses this issue directly, it will apply the Tenth Circuit's pronouncement that Bruton "does not apply to nontestimonial statements."  287 F. Supp. 3d at 1262.

## ANALYSIS

The Court denies the Severance Motion.  According to the Tenth Circuit, there are three steps to a severance analysis.  See United States v. Pursley, 474 F.3d at 765.  First, the trial court determines whether the defendants' defenses are "so antagonistic that they are mutually exclusive."  Pursley, 474 F.3d at 765 (quoting United States v. Peveto, 881 F.2d 844, 857 (10th Cir. 1989)).  Second, the trial court evaluates whether there is a "serious risk that a joint trial would

compromise a specific trial right . . . or prevent the jury from making a reliable judgment about guilt or innocence." United States v. Pursley, 474 F.3d at 765 (quoting Zafiro, 506 U.S. at 539). Finally, "if the first two factors are met, the trial court exercises its discretion and 'weigh[s] the prejudice to a particular defendant caused by joinder against the obviously important considerations of economy and expedition in judicial administration.'" United States v. Pursley, 474 F.3d at 765 (quoting United States v. Peveto, 881 F.2d at 857).

The Court addresses the United States v. Pursley steps out of order in the Analysis, because the Severance Motion focuses on step two, the potential prejudice to Stapleton's trial rights under Bruton. Accordingly, the Court proceeds as follows. First, the Court addresses United States v. Pursley's second step, whether a joint trial will compromise Stapleton's Bruton rights. Here, Stapleton cannot show that Johnson's testimony in the joint trial would "compromise" one of her "specific trial right[s]." Zafiro, 506 U.S. at 539. United States does not believe Johnson's story. Accordingly, the jury only will hear Johnson's statements casting blame on Stapleton if Johnson takes the stand at the joint trial. If Johnson takes the stand at the joint trial, Stapleton can cross-examine him, and the United States can cross-examine him, too. This eliminates any risk to Stapleton's Bruton rights.

Second, the Court addresses United States v. Pursley's first step, whether the defenses are so antagonistic that they are mutually exclusive; if the defenses are mutually exclusive, a jury might not be able to make a "reliable judgment about guilt or innocence" in a joint trial. Zafiro, 506 U.S. at 539. As to this step, the Court concludes that the defenses are not so antagonistic as to be mutually exclusive and, therefore, that the defenses do not raise the risk that the jury will be unfair to Stapleton. Third, and finally, the Court addresses United States v. Pursley's third step -- balancing. At this step, because Johnson's testimony will not prejudice Stapleton under Zafiro,

and the likelihood that Johnson testifies and tells the jury that Stapleton stole from him is low, the Court concludes that a joint trial's efficiency outweighs any potential prejudice to Stapleton. Accordingly, the Court denies Stapleton's request to sever her trial from Johnson's trial.

## I.    STAPLETON CANNOT SHOW, UNDER <u>ZAFIRO</u>, THAT A JOINT TRIAL WILL COMPROMISE ONE OF HER TRIAL RIGHTS.

A defendant requesting that the district court sever his or her trial from the co-defendant's trial must show: (i) "actual prejudice outweighing the expense and inconvenience of separate trials"; and (ii) "inadequacy of less drastic means to cure potential prejudice (like limiting instructions)." United States v. Herrera, 51 F.4th 1226, 1271 (10th Cir. 2022)(Bacharach, J.)("Herrera")(citing United States v. Hutchinson, 573 F.3d 1011, 1025-27 (10th Cir. 2009)). "Actual prejudice exists only if the Defendants have shown 'a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" Herrera, 51 F.4th at 1272 (quoting Zafiro, 506 U.S. at 539). Neither concern exists here. The Court begins its analysis, however, by discussing whether a joint trial will compromise one of Stapleton's specific trial rights.

Before turning to this analysis' substance, the Court notes several relevant presumptions and standards of review in the severance context. Although presumptions and standards of review are often less influential than they appear, the Court, nevertheless, repeats these legal standards here. First, rule 14 of the Federal Rules of Criminal Procedure "leaves the determination of risk of prejudice and any remedy for such prejudice" to the district court's "sound discretion." Herrera, 51 F.4th at 1271 (quoting United States v. Morales, 108 F.3d 1213, 1220 (10th Cir. 1997)). "Given this discretion," defendants seeking appellate review of a district court's denial of a severance motion face a "steep challenge." Herrera, 51 F.4th at 1271 (quoting United States v. Clark, 717

F.3d 790, 818 (10th Cir. 2013). See Herrera, 51 F.4th at 1275 (acknowledging that the defendants waived their severance arguments on appeal, but concluding that, "[e]ven without a waiver, the district court would not have abused its discretion in declining to sever the trials of Mr. Sanchez and Mr. Baca"). Second, courts presume that juries follow limiting instructions. See Herrera, 51 F.4th at 1273 ("We often consider limiting instructions because we presume that juries follow them."). In the Tenth Circuit, these principles color the prejudice analysis.

Turning to United States v. Pursley step two, the Court concludes that there is not a "serious risk" that trying Stapleton and Johnson together will compromise one of Stapleton's "specific trial rights." Zafiro, 506 U.S. at 539. In the Severance Motion, Stapleton advances the argument that "Johnson's statements present a Bruton issue for Sheryl Stapleton at trial." Severance Motion at 7. As Stapleton puts it, Bruton stands for the proposition that, "in a case in which defendants are being tried jointly, a violation of the Confrontation Clause arises if a statement by a non-testifying codefendant used by the prosecution against that codefendant also implicates the defendant." Severance Motion at 7-8 (citing Bruton, 391 U.S. at 124). Johnson has made out-of-court statements that accuse Stapleton of writing herself checks from the Robotics Management account without his authorization. See supra, at 6. Stapleton fears that if Johnson invokes his right to silence and declines to testify, the United States will introduce his out-of-court statements as party-opponent statements. See Severance Motion at 7 (citing Fed. R. Evid. 801(d)(2)). If the United States introduces Johnson's out-of-court statements, and Johnson does not testify, Stapleton could not cross-examine him about his statements, which would violate her Bruton rights. See Severance Motion at 10.

This scenario is not going to happen. In the Severance Response, the United States explains that it "has no intention of introducing Johnson's out-of-court statements that he did not know

about or authorize payments from Robotics to Stapleton . . . . Obviously the United States does not credit Johnson's out-of-court statements -- he is a named defendant in this case."  Severance Response at 7.  At the hearing, moreover, the United States emphasizes that it "does not have statements that it wishes to rely on the co-conspirator exception to the hearsay rule as its justification for admissibility."  Tr. at 7:8-19 (Peña).    It follows from the United States' representations that the only way for the jury to hear Johnson's accusations regarding the checks is for Johnson to take the stand at trial and testify.  If Johnson takes the stand and testifies, Stapleton can cross-examine him, thus exercising her confrontation rights and eliminating the possibility of the Bruton violation that she fears.  Johnson will be an adverse witness, just like the ones that the United States calls.

In sum, the United States' representations take Stapleton's theorized Confrontation Clause violation off the table.  Stapleton has not pointed to any other specific trial right, moreover, that a joint trial would compromise.  Accordingly, under United States v. Pursley's second step, Stapleton cannot show prejudice on the grounds that a joint trial will compromise one of her trial rights.

## II.    STAPLETON CANNOT SHOW THAT A JOINT TRIAL WILL PREVENT THE JURY FROM MAKING RELIABLE DETERMINATIONS ABOUT HER GUILT OR INNOCENCE.

Next, the Court moves to United States v. Pursley's first step.  Here, the Court concludes that Stapleton's and Johnson's defenses are not so antagonistic as to be mutually exclusive. Consequently, there is not a serious risk that a joint trial will prevent the jury from making reliable determinations about Stapleton's guilt or innocence.

Given that the United States disclaims any intent to introduce Johnson's statements at trial, Stapleton's Severance Reply turns its focus away from Bruton and towards the mutually

antagonistic defenses doctrine. "[D]efenses are mutually antagonistic if 'the conflict between codefendants' defenses [is] such that the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other.'" United States v. Pursley, 474 F.3d at 765 (quoting United States v. Linn, 31 F.3d at 992). The mere existence of mutually antagonistic defenses does not mandate severance. See Zafiro, 506 U.S. at 538 (declining to adopt a per se rule that mutually antagonistic defenses mandate severance). Even if a jury might conclude "that both defendants are lying and convict them both on that basis," Zafiro, 506 U.S. at 540, "it is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." Zafiro, 506 U.S. at 540 (citing United States v. Martinez, 922 F.2d 914, 922 (1st Cir. 1991), and United States v. Manner, 887 F.2d 317, 324 (D.C. Cir. 1989)). "A defendant normally would not be entitled to exclude the testimony of a former codefendant if the district court did sever their trials," the Supreme Court explains, "and we see no reason why relevant and competent testimony would be prejudicial merely because the witness is also a codefendant." Zafiro, 506 U.S. at 540. It is also possible, however, that a jury might conclude, based on two defendants' mutually antagonistic defenses, that "at least one of the two must be guilty without regard to whether the Government has proved its case beyond a reasonable doubt." Zafiro, 506 U.S. at 540. This scenario, which the Court from now on describes as "mutually exclusive defenses," comes with "some risk of prejudice," Zafiro, 506 U.S. at 540, and requires a close look at the case's facts.

Stapleton describes her defense in very general terms. Her Severance Motion states that she "cannot raise any argument about the payments being legitimate or otherwise address those payments," Severance Motion at 5, and her Severance Reply states that "any defenses" she "may have of legitimate funds being made to her is directly contradicted by" Johnson's position.

Severance Reply at 4. While Stapleton's descriptions of a legitimate-payments defense are vague, it is possible for her defense to be consistent with, and not antagonistic to, Johnson's defense, at least for certain counts in the Indictment.

The Indictment's counts correspond to two buckets of payments, the payments from APS to Robotics Management, and the payments from Robotics Management to Stapleton, to her businesses, and to her nonprofits. Johnson's defense as to both buckets is easily summarized: He never entered into a kickback agreement with Stapleton, and he never approved her writing checks to herself, to her businesses, and her nonprofits from Robotics Management's accounts. As to bucket one, the payments from APS to Robotics Management, Stapleton's legitimate-payments defense is not antagonistic to Johnson's defense. For example, the Indictment's first count charges both Stapleton and Johnson with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. See Indictment, ¶ 17, at 12. According to the Indictment, Stapleton and Johnson conspired to "invoice for, approve, facilitate, and deposit payments to Robotics in excess of services rendered and in excess of contract limits." Indictment, ¶ 16, at 6-7. Stapleton's legitimate-payments defense, here, might mean that she intends to present evidence that these payments do not exceed what the contracts between APS and Robotics Management allow. She also might argue that the United States cannot prove beyond a reasonable doubt that the APS-to-Robotics-Management payments are excessive. Most of Johnsons' out-of-court statements pertain to the second payment bucket, but the Johnson Decl. states, as to the first payment bucket, that "Robotics was a bona fide company providing educational services, including the CyberQuest software, to APS." Johnson Decl. ¶ 4, at 1. In all likelihood, Johnsons' position is that APS did not pay Robotics Management a dime more than what it owed under the contract. This position is consistent with what Stapleton says about her defense, that the payments, writ large, are legitimate. See Severance Response at

4 ("As to the first layer of payments, both defendants have equal incentive to argue that the payments from APS to Robotics were legitimate."). The bottom line is that both Defendants are likely to defend against the first-bucket charges in a similar, non-antagonistic way.

As to the second bucket of payments -- the payments from Robotics Management to Stapleton that she allegedly uses for her personal benefit -- Stapleton's defense is also not mutually exclusive with Johnsons' defense. The Indictment describes a mutually beneficial kickback scheme. It does not allege that Stapleton stole from Johnson. If the Indictment alleged that Stapleton sole from Johnson, then her defense and Johnson's defense would be mutually exclusive. This is not the situation here.

Admittedly, predicting the legitimate-payment defense's contours in relation to the second bucket is more difficult. See United States v. Gant, 487 F.2d at 34 n.3 ("We recognize that it is awkward for a trial court to have to appraise a severance problem at the beginning of a trial without any evidence . . . ."). Even so, Stapleton's vague assertions do not demonstrate persuasively that her defense is mutually exclusive with Johnson's defense. Stapleton is concerned that Johnsons' out-of-court statements accusing her of taking money from Robotics Management without his permission will unfairly prejudice her defense. She states that "in a joint trial . . . Stapleton will be forced to face accusations of government kickbacks from the government, and then, on defense, face accusations that the funds alleged to be kickbacks were funds stolen from Mr. Johnson rather than funds he had willingly given her as a kickback." Severance Reply at 2. If Stapleton was charged with stealing from Johnson, her defense might be that Johnson gave her permission to write the checks. This defense, and Johnson's position in his out-of-court statements, are mutually exclusive: Either Johnson gave Stapleton permission to write the checks, or he did not. A jury must believe one story or the other.

The Indictment does not allege, however, that Stapleton stole from Johnson; instead, it describes a mutually beneficial kickback agreement. The Indictment alleges[8] that: (i) Stapleton and Johnson conspired to defraud the United States, see Indictment ¶ 15, at 6; (ii) Johnson bribed Stapleton by allowing her to fill in and cash blank checks from Robotics Management's account in exchange for her help procuring the Robotics Management/APS contract, see Indictment ¶¶ 18-19, at 12; id. ¶ 21, at 13; (iii) Stapleton and Johnson "devised . . . a scheme" to engage in honest-services fraud (the underlying criminal conduct as to this count is the same checks-for-contracts scheme), Indictment ¶ 23, at 14; (iv) Stapleton and Johnson committed money laundering by writing checks to the Ujima Foundation and the Charlie Morrisey Foundation "with the knowledge that the transaction was designed . . . to disguise the nature . . . of the proceeds of" the kickback scheme, see Indictment ¶ 28, at 17; and (v) Stapleton conspired with Johnson to commit money laundering, see Indictment, ¶ 30, at 18. Each of these charges is predicated on the existence of a checks-for-contracts agreement between Stapleton and Johnson. Accordingly, if Johnson testifies that he did not give Stapleton permission to write the checks, and Stapleton argues, in response, that Johnson did give her permission to write the checks, Stapleton's rebuttal to Johnson's testimony is not an effective defense to any of the above charges. Stapleton's rebuttal, that she had Johnson's permission to write the checks, does not negate an element of the agreement-based charges; instead, evidence that Johnson gave her permission to write the checks may advance the United States' theory of the case by inadvertently assisting the United States in proving that Stapleton and Johnson are co-conspirators who agreed to run a mutually beneficial kickback scheme. In sum, to defend against the Indictment, Stapleton must do more than merely assert that

---

[8]The Indictment also charges Stapleton with tax fraud in violation of 28 U.S.C. § 7206(1). Indictment ¶ 27, at 17.

Johnson permitted her to write the checks.

Stapleton might advance a stronger argument, namely, that the payments that the Indictment describes are all above-the-board business transactions traceable to specific agreements for Stapleton to perform legitimate services for Robotics Management. This argument is a defense against the Indictment's agreement-based charges, and if Stapleton makes this argument at trial, the conflict between this defense and Johnson's defense becomes oblique. Johnson tells the FBI that, if Stapleton "wrote checks to the restaurant out of the Robotics account, she should not have done that. I don't want to characterize her as stealing from me. But she should not have done that." Johnson Tr. at 87:7-10. If Stapleton presents evidence that, contra to Johnson's understanding of the evidence that the FBI presents to him in his living room, Stapleton wrote the checks because she performed some legitimate service for Robotics Management, Johnson may not be able to push back against that theory. Similarly, Stapleton might argue that she used some of the checks to pay for after-school programs that Johnson agreed to fund. This argument also benefits Johnson, because it pushes back against the United States' allegation that the checks are bribes for Stapleton's personal use and benefit. Accordingly, the Defendants' defenses as to the second payment bucket may end up being similar to their defenses as to the first payment bucket: There is no bribery scheme. All these transactions occurred in the normal course of business.

The bottom line is that Stapleton's and Johnson's defense as to Indictment's agreement-based charges are not mutually exclusive, because they can coexist; therefore, they also are not mutually antagonistic, at least at this relatively early stage of the case. This conclusion is consistent with Zafiro and the Tenth Circuit case of United States v. Jones, 530 F.3d 1292 (10th Cir. 2008)(Henry, C.J.)("Jones"). In Jones, a jury convicts co-defendants Shyla Jones and Anthony Wright of bank fraud and conspiracy to commit bank fraud. See 530 F.3d at 1297. Jones works

at Wells Fargo, where she has access to confidential customer information; she shares this information with her romantic partner, Wright.  See 530 F.3d at 1297.  Together, they produce false checks from high-activity accounts and cash those checks for themselves.  See 530 F.3d at 1297.  The indictment charges Jones and Wright together, and they are tried and convicted together.  See 530 F.3d at 1297.

On appeal, Wright argues that the district court should have severed his trial from Jones' trial, because his defense is "mutually exclusive" to her defense.  See 530 F.3d at 1304.  Wright contends that "the core of his defense was that the government's witnesses were lying and that he did not in fact commit bank fraud or enter into a conspiracy to do so."  530 F.3d at 1304.  He argues that Jones' counsel made arguments that "were antagonistic to this defense," namely, her arguments that "Wright orchestrated the bank fraud and even exercised some measure of control over Ms. Jones."  530 F.3d at 1304.  The Tenth Circuit affirms the district court's order denying Wright's severance motion, stating: "To be sure, these statements were antagonistic to Mr. Wright's defense, but" they "were not so antagonistic to Mr. Wright's that the two defenses were mutually exclusive."  530 F.3d at 1304.  The Tenth Circuit observes that "Wright's guilt was not, in itself, a viable legal defense for Ms. Jones . . . . [T]he 'core' of Ms. Jones's defense -- that she did not act knowingly or voluntarily with respect to any of the alleged acts -- did not necessarily depend on Mr. Wright's guilt."  530 F.3d at 1304 (this District Court adds brackets).  In the Tenth Circuit's view, "the jury could have simultaneously believed that the government's witnesses were lying about Mr. Wright's involvement in the bank fraud conspiracy and that Ms. Jones did not knowingly commit bank fraud."  530 F.3d at 1304.

The relationship between Jones' and Wright's defenses in Jones is analogous to the relationship between Stapleton's and Johnson's defenses in this case.  In the Jones trial, Wright

defends against the United States' accusations that he committed bank fraud, and Wright also defends against his co-defendant's accusations that he "orchestrated the bank fraud" and "exercised some measure of control over" Jones.  530 F.3d at 1304.  Here, Stapleton worries that she may have to defend against the United States' accusations that she accepted bribes and participated in a kickback conspiracy, and she worries that she also may have to defend against Johnson's accusations that she wrote checks from his company's accounts without his permission. Even though Johnson's accusations are antagonistic to Stapleton in the sense that they do not make her look good, they are not so antagonistic as to be mutually exclusive, meaning the defenses might lead a jury to conclude that "at least one of the two must be guilty without regard to whether the Government has proved its case beyond a reasonable doubt." Zafiro, 506 U.S. at 540.  To use Jones' language, Stapleton and Johnson's jury could "simultaneously believe" Johnson -- by concluding that Stapleton stole from him -- and acquit Stapleton of the conspiracy counts -- by concluding that Stapleton never entered into an agreement with Johnson to give him and Robotics Management the APS contract in exchange for the checks.  530 F.3d at 1304.  Accordingly, under United States v. Pursley's first and second steps, Stapleton's defense is not mutually antagonistic to Johnson's defense, because the defenses can coexist, and Johnson's defense is not prejudicial to Stapleton, because it would not prevent the jury from making a reliable judgment about guilt or innocence.  See 474 F.3d at 765 (stating these steps).

## III.    EVEN WHEN THE DEFENSES ARE AT THEIR MOST ANTAGONISTIC, JUDICIAL EFFICIENCY OUTWEIGHS THE POTENTIAL PREJUDICE TO STAPLETON.

United States v. Pursley instructs trial courts to weigh prejudice against efficiency only "if the first two factors are met," mutual antagonism and prejudice.  474 F.3d at 765.  As discussed above, Stapleton's and Johnson's defenses are not mutually exclusive as to the Indictment's

agreement-based counts, so there is no prejudice.  However, there is one other count pertaining to the alleged kickback scheme that is not an agreement-based count.  This final section, therefore, analyzes the potential antagonism as to the money laundering counts  , engages in United States v. Pursley's third-step balancing, and concludes that the risk of prejudice remains low compared to judicial efficiency's benefits.

The money laundering counts, counts 26-34, allege that Stapleton, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and (a)(2),

> did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, to wit, writing and depositing checks from the Robotics business account as described below, which involved the proceeds of a specified unlawful activity, that is, violations of 18 U.S.C. §§ 666 and 1341, while acting with the knowledge that the transaction was designed in whole or part to disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity, and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity . . . .

Indictment ¶ 28, at 17-18.  The Indictment alleges that Stapleton's money laundering covers up the proceeds of two unlawful activities: (i) violations of the theft-concerning-programs-receiving-federal-funds statute, 18 U.S.C. § 666; and (ii) violations of the mail fraud statute, 18 U.S.C. § 1341.

Unlike the Indictment's other charges discussed above -- including Count 35's conspiracy-to-commit-money-laundering charge, see Indictment ¶ 30, at 18 -- the United States does not need to prove an agreement as an element of the money laundering charge.  The elements of a § 1956(a)(1)(B)(i) offense, according to the Tenth Circuit Criminal Pattern Jury Instructions, are:

> First: the defendant [conducted] [attempted to conduct] a financial transaction;
>
> Second: the financial transaction involved the proceeds of [specify

unlawful activity from 18 U.S.C. § 1956(c)(7)];

>       Third: the defendant knew that the property involved in the [financial
>       transaction] [attempted financial transaction] represented the proceeds of some
>       form of unlawful activity; and
>
>       Fourth: the defendant [conducted] [attempted to conduct] the financial
>       transaction knowing that it was designed in whole or in part to conceal or
>       disguise the nature, location, source, ownership, or control of the proceeds of
>       unlawful activity.

Criminal Pattern Jury Instruction Committee of the United States Court of Appeals for the Tenth

Circuit, CRIMINAL PATTERN JURY INSTRUCTIONS § 2.73.1, at 222 (2025)(MONEY

LAUNDERING CONCEALING ILLEGAL PROCEEDS (18 U.S.C. § 1956(a)(1)(B)(i)).  These

elements do not include an agreement; moreover, the Indictment's specified unlawful activities

that correspond to the third money laundering element, mail fraud and theft of federal funds, are

not necessarily agreement-based crimes.

       In theory, if Johnson testifies that Stapleton stole from him, and the jury does not believe

that Johnson and Stapleton agreed to a kickback scheme, the jury still could convict Stapleton of

money laundering, if the jury concludes that she stole from Robotics Management.  This scenario

is not likely, however, because it is not predicated on the United States' theory of the case.  To

convict Stapleton of money laundering based solely on the theory that she stole funds from

Robotics Management, the Court would have to read the jury a set of jury instructions that will not

exist, because the United States will not agree to them.  In this scenario, the money laundering jury

instructions would describe Stapleton as a lone wolf who steals not from APS, but from Robotics

Management.  The Court predicts that none of the parties will advance this theory at trial.  The

United States argues that APS is the victim, and that Robotics Management is a front with the

primary purpose of enriching Stapleton and Johnson by taking improper amounts of APS money,

some of which originates from the federal government.  See Indictment ¶ 4, at 2 ("From at least 2013 through 2021, APS received more than $10,000 in federal Perkins funds from the U.S. Department of Education in each calendar year.").  The United States has charged both Stapleton and Johnson criminally in accordance with this theory.  Only Johnson, therefore, would have the motivation to advance this theory.  Strategically, this notion is unlikely.  Instead of trying to convince the jury that he never entered into a bribery agreement with Stapleton and, simultaneously, persuade the jury that Stapleton has committed offenses that are legally and factually distinct from the Indictment's allegations, the simpler option for Johnson is to attack the United States' evidence that Stapleton and he formed a kickback agreement.  Regardless whether Johnson ultimately adopts this strategy, the likelihood that Stapleton and Johnson cooperate to mount a stronger joint defense is higher than the likelihood that the case turns into a three-way firing squad that confuses the jury and undermines each defendants' likelihood of acquittal.  See Turner v. United States, 582 U.S. 313, 330-34 (2017)(Kagan, J., dissenting)(arguing, in a case about a jointly committed murder, that a "unified counter-narrative" would have been a stronger defense than a "circular firing squad" defense, where each defendant "contends only that he wasn't part of the rampaging group" that kills the victim)(emphasis in original).

In sum, a closer look at Stapleton's and Johnson's potential defenses as to the money laundering charges reveals the following.  First, it is legally possible for a jury to convict Stapleton on the money laundering count without the United States proving an agreement's existence.  Accordingly, Stapleton's "he gave me permission" defense is a true defense to this charge, because it negates the charge's second element, that the financial transaction involves an unlawful activity's proceeds.  If Johnson gave Stapleton permission to write the checks for legitimate reasons, the financial transaction would not involve an unlawful activity's proceeds.

- 49 -

However, if Johnson responds to Stapleton's permission argument by testifying that Stapleton stole from him, Johnson's response cannot coexist with Stapleton's defense.  So, the defenses would be mutually exclusive.  A jury must pick whom to believe.  Nevertheless, the risk of prejudice remains low, because these defenses do not collide unless the jury hears about a legal theory that the United States will not advance and that is not in the Indictment.  Johnson, to advance this theory, would have to act as a prosecutor.  He would have to argue for a set of jury instructions that, by portraying Robotics Management, rather than APS, as the money laundering victim, exculpate himself and inculpate Stapleton.  This set of jury instructions is untethered from the Indictment, and the United States will not agree to them.  Accordingly, while the money laundering count allows, in theory, for Stapleton's and Johnson's defenses to collide in a mutually exclusive way, the risk of prejudice to Stapleton -- that the jury will not put the United States to its burden -- remains low.

After analyzing the risk of prejudice from mutual exclusivity as to the money laundering count, the last United States v. Pursley step is to weigh the potential prejudice against the efficiency of a joint trial.  As the preceding analysis demonstrates, when the defenses are at their closest to mutual exclusivity -- on the money laundering count -- a closer look reveals that the threat of prejudice remains quite low.  Additionally, separate and apart from this conclusion, Johnson is not likely to testify.  When a defendant takes the stand, it is always a risky proposition.  Their credibility with the jury is at stake in a direct and personal way.  In a white-collar case, the United States may try to prove mens rea with circumstantial evidence.  It may be safer for Johnson to push back against the United States' inferential chain through cross-examination instead of fighting back with his own testimony:  Johnson does not need to take the stand to argue that the United States cannot prove an agreement.  Accordingly, the low likelihood that Johnson testifies lowers

the prejudicial risk that the jury hears his statement that concerns Stapleton the most -- namely, that she did not have permission to write the checks.[9]

The other side of the balancing equation, efficiency, weighs in a joint trial's favor. The United States represents that its "evidence against each defendant will be substantially identical." Tr. at 31:14-16 (Peña). This representation distinguishes this case's evidence from the evidence in a racketeering case like DeLeon, in which, "[a]lthough the Defendants allegedly share SNM membership, the seven distinct offenses are largely factually dissimilar." DeLeon, 2021 WL 6134696, at *41. In sum, holding one trial preserves judicial resources, prevents duplicative testimony and evidence, and facilitates the timely resolution of this criminal case. See United States v. Gray, 173 F.Supp 2d at 18 (describing the groupings of co-defendants as "the most efficacious in preserving judicial resources, preventing duplicitous testimony and evidence, and reaching an expeditious resolution for all defendants").

In conclusion, the Court thinks that the chance of a jury hearing Johnson's suggestion that Stapleton may have stolen from him is low. First, in a joint trial, the United States does not intend to introduce Johnson's denials and suggestions of theft. Hence, the only way that it will come into evidence is if Johnson takes the stand, which could be treacherous for him if the United States' evidence is as strong as it says it is. Second, if the Court severs the two trials, the Stapleton jury will not hear the theft suggestion if it goes first. Third, if the Court severs the two trials and the Johnson jury goes first, and he is acquitted, he could be called in the second trial, but again, neither

---

[9]It is possible for the jury to hear Johnson's "she stole from me" theory even if he does not testify. For example, during summation, Johnson's lawyers could tell the jury that Stapleton stole from him. This scenario, however, poses less of a risk of prejudice than the scenario in which Johnson testifies. Hearing the accusation from Johnson on the stand would be more powerful than hearing the accusation from his lawyers. Accordingly, analyzing the possible prejudice to Stapleton resulting from Johnson testifying considers the maximally prejudicial scenario.

the United States nor Stapleton wants to hear his story and are unlikely to call him.  Fourth, if the Court severs the two trials and Johnson does not testify in his trial, the Court will be trying two almost identical trials of no benefit to anyone.  The different scenarios do not counsel for a severance, because the chances of a jury hearing the theft story is low and manageable, because Stapleton and the United States can cross-examine Johnson.

**IT IS ORDERED** that Defendant Sheryl Stapleton's Motion for Severance of Defendant Joseph Johnson For Trial, filed December 5, 2024 (Doc. 43), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Alex M.M. Uballez
  United States Attorney
Jeremy Peña
  Assistant United States Attorney
Fred Federici
  Assistant United States Attorney
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Ryan J. Villa
The Law Office of Ryan J. Villa
Albuquerque, New Mexico

--and--

Ahmad Assed
Law Office of Ahmad Assed
Albuquerque, New Mexico

    *Attorneys for Defendant Sheryl Stapleton*

Marc M. Lowry
Rothstein Donatelli L.L.P.
Albuquerque, New Mexico

*Attorneys for Defendant Joseph Johnson*